## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CLAUDIA RAMOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. |
| | ) | 22-cv-4077 |
| DARIN ZOFFOLI, STEVEN BEHAR, | ) | |
| HEATH HILL, DANIEL FUNG, and | ) | COMPLAINT |
| AMERICAN MADE VAPES, INC., a | ) | |
| New York Corporation, and VANTAGE | ) | Trial By Jury Demanded |
| INNOVATION LLC, a Wyoming | ) | |
| Limited Liability Corporation, | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| L. Forty Three, LLC, | ) | |
| | ) | |
| Nominal Defendant | ) | |

## COMPLAINT

Plaintiff Claudia Ramos ("Plaintiff" or "Ms. Ramos") by and through her undersigned counsel, brings this action, by and through undersigned counsel, derivatively on behalf of nominal defendant L. Forty Three, LLC, ("L43" or the "Company"), and directly, against Defendants Darin Zoffoli ("Zoffoli"), Steven Behar ("Behar"), Heath Hill ("Hill"), Daniel Fung ("Fung"), American Made Vapes, Inc. ("AMVI") and Vantage Innovation, LLC ("Vantage"). Plaintiff alleges as follows:

00031403.1

## NATURE OF THE ACTION

1.      This lawsuit arises out of Defendants' wrongful and complete appropriation of all of nominal defendant L43's business.  The Company is a two-member Delaware LLC in which both Zoffoli and Ramos were managers and 50 percent membership unitholders.

2.      In collaboration and conspiracy with each other, Defendants brazenly stole all of L43's business—its intellectual property, operations, investors, suppliers, advisors, industry contacts and all business opportunities—and formed a new LLC in Wyoming using the Company's assets to produce and sell the same product L43 had been formed to produce and sell.

3.      The conduct of Zoffoli, Behar and Hill described below constitutes a breach of the duty of loyalty.  Additionally, the actions of all Defendants constitutes tortious conduct and fraud.  Moreover, the Defendants' conduct violated federal and state law governing trade secrets.

## THE PARTIES

4.      Plaintiff is an individual who is a citizen of Florida.  Ramos is one of the Company's two members and holds 50 percent of the Company's membership units.

5.      Defendant Zoffoli is an individual who, upon information and belief, is domiciliary of Connecticut.  Zoffoli is the other member of the Company.

6.      Defendant Behar is an individual who, upon information and belief, is a domiciliary of New York, whose principal place of business is in this District, and who is an attorney licensed to practice in the State of New York.

7.      Defendant Heath Hill is an individual who, upon information and belief, is domiciled in New Jersey.

8.      Defendant Fung is an individual, who, upon information and belief, is domiciled in New York State.  Fung describes himself as "an extracts expert who is dedicated to providing the best overall product to customers in the [medical marijuana] industry."  According to his publicly available LinkedIn Page, Fung is the CEO of Dank Vape Tech, and is also the CEO of Defendant AMVI.

9.      Defendant AMVI is a New York corporation registered in New York county (company number 5630805). According to open-source information set forth on the New York State Department of State Division of Corporations' website, AMVI was formed on October 1, 2019, and lists as its address 1160 Fifth Avenue, Apt. 306, New York, NY 10029.  Upon information and belief, the preceding address is also Fung's residential address.

10.      AMVI's website URL is www.americanmadevape.com (last accessed Jun. 9, 2022).  According to this website, AMVI was formed to address the problem of Chinese-manufactured vape carts failing California lab testing for heavy metals. AMVI warned that "[t]hese and other unregulated carts have already caused toxin

poisoning in the USA, with hospitals reporting increased admittances due to vape-related illnesses."   AMVI boasted of thus being: "…the only disposable vape cartridge (for medicinal and recreational use) that are 100% made in America with 0% heavy metals" and claims:

> The Tobacco Master Settlement Agreement set the legal precedent that a company that knowingly sells a toxic product can be held financially liable. This means our products allow our distributors to significantly reduce their liability related to selling products with components containing heavy, toxic metals.

> What's more, AMERICAN MADE VAPE carts are guaranteed-clean vape carts manufactured in a GMP certified facility in the USA. By sourcing component parts from a trusted US-based company means that AMV will remain accountable for our GMP certified production practices in United States Courts of Law.

11.     AMVI's website further advertises the opportunities it presents to the vape retail market, and claims:

> To ensure our consumers are able to find our clean metal products, AMV will maintain an online Vendor List of our exclusive distributor partners by market; directing consumers to our distributor partners committed to a vape future without heavy metal concerns. This will be a list of 'good' operators that care about their consumers' lung health and committed to buying from an American-made source.

> Distributors / vendors that exclusively sell AMV vape carts will be given an AMV Exclusive Partner Emblem as further reassurance to consumers.

12.     AMVI's website also touts Fung's experience and expertise, and states:

> Dan Fung, Founder and CEO of American Made Vape (AMV), is a successful, serial entrepreneur. With a Bachelor of Arts in Psychology from The University of Pennsylvania, he has a unique ability and passion to unearth customer-centric insights that fuel consumer anticipation and build ground-breaking businesses.

***

Dan put his passion for improving life to learning all he could about this under-researched topic and the benefits it brings to pain relief and other ailments. This led to the role of Head of Extraction for Theraplant, one of the four Licensed MMJ Producers in the Connecticut MMJ program, to foresee real and important needs for the highest-quality vape pens.

In 2019, while analyzing existing vape pens, Dan saw that the majority are imported from China - where, not only is quality control scarce but the materials used could produce health-damaging effects in users. AMV is the genesis of this understanding and foresight and is focused on improving the lives of medical patients. Which is why AMV vape carts are 100% made in the USA with 0% heavy, toxic metals.

During his Theraplant days, Dan also discovered, in is vape oil tests, that nearly all the existing vape technology at the time was burning the oil too hot, and that the flower taste was indistinguishable from the oil it was made from. This brought him the realization that if the consumer cannot "taste" the marijuana terpene flavor in the oil, the fullest medicinal / uplifting effects could not be achieved.

Subsequently, Dan took this advanced understanding of terpenes and designed a branded line of low-temp vaping devices with the specific aim of allowing consumers to tase the cannabis terpenes in their vape products. As an extraction artist, Dan's unique point of view as a vape designer puts the conservation of the users' concentrate while maximizing the flavor and medicinal impact as a priority. In 2016, this gave birth to the development and introduction of four concentrate vape pen lines; winning multiple awards from High Times.

More recently, Dan has filed a US patent for another revolution; specifically, for vape cartridge use. 'The Double' is an auto-draw concealed double vape battery that is ergonomically designed to hit two 510 thread vape cartridges, simultaneously. With 'The Double', consumers can mix and match different pairings of vape oil carts—limited only by their imagination. 1:1 vape blends using CBD cart and THC cart pairings. Or Sativa / Indica hybrid pairings of favorite strains. Or even CBD / CBD pairing of 2 different kinds of CBD strains for a blended medicinal vape effect can all be achieved. All of which provide fast-acting, broad cannabinoid receptor-activating relief. …

Combining depth of expertise, an unquenching desire for innovation and unique ability to understand consumer demand and need, Dan continues to develop businesses and products for the betterment of us all. American Made Vape is his newest and, possibly, most exciting venture to date.

13.     Defendant Vantage Innovations LLC ("Vantage") is a limited liability corporation organized under the laws of the State of Wyoming.  According to open-source records on the website of the Wyoming Secretary of State's Business Center, the company was formed on September 28, 2020, by Defendant Behar as organizer, and lists as its principal address 30 N. Gould Street, Suite R, Sheridan, WY.

14.     On information and belief, Vantage's membership unit holders are Defendants Zoffoli, Behar and Hill.

15.     The Company is a Delaware limited liability company with its principal place of business located in Connecticut that was formed to manufacture and sell various products, including a specifically designed vaporizer cartridge.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action by virtue of 28 U.S.C. §1331, as this Complaint arises under, *inter alia*, the Defend Trade Secrets Act, (the "DTSA", 18 U.S.C. §1831 *et seq.)*.   The District Courts of the United States possess original jurisdiction over civil actions brought under the DTSA pursuant to 18 U.S.C. §1836(c).

17.     This Court has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. §1367(a), as the claims at issue are so closely related that

they form part of the same case or controversy.  Plaintiff's state law claims share all common operative facts with her and L43's federal law claims, and the parties are identical.  Resolving the federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

18.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

19.    Venue is properly set in this District pursuant to 28 U.S.C. §1391(b) since Defendants transact business within this District.  Likewise, a substantial part of the events giving rise to the claims herein occurred within this District.  Furthermore, as alleged *infra*, a certain non-disclosure agreement executed between Fung and the Company explicitly provides for jurisdiction in this District.

20.    Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution, this Court has personal jurisdiction over Defendants, because Defendants are present in the State of New York, such that requiring an appearance does not offend traditional notions of fair play and substantial justice.

21.    This court has personal jurisdiction over Defendants pursuant to and consistent with the Constitutional requirements of due process because Defendants,

acting through their agents or apparent agents, each committed one or more of the following:

      a.    The transaction of any business within the state;

      b.    The making of any contract within the state;

      c.    The commission of a tortious act within this state; and

      d.    The ownership, use, or possession of any real estate situated within this state.

22.    Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice and is permitted by the U.S. Constitution.  All of Plaintiff's claims arise in part from conduct Defendants purposefully directed to New York.  On information and belief, Defendants' products are targeted to many local and national businesses in the vaping and cannabis product industries, throughout the State of New York.  On information and belief, Defendants have availed themselves of numerous advertising and promotional materials regarding their products specifically intended to reach consumers in New York.

23.    Plaintiff's claims arise partly out of Defendants' design, marketing and sale of products in the State of New York.  The interstate commerce giving rise to the claims alleged herein was partly carried out within this District.

24.    Defendants regularly conduct or solicit business and derive substantial revenue from goods used or consumed in, *inter alia,* the State of New York.

25.     On information and belief, each Defendant was the agent and employee of each other Defendant, and in doing the things alleged was acting within the course and scope of such agency and employment and with each other Defendant's actual or implied permission, consent, authorization, and approval.

26.     Moreover, Defendants acted as co-conspirators with each other and performed acts in furtherance of their unlawful conspiracy within New York and elsewhere in the United States.

27.     Plaintiff's claims as alleged in this Complaint are related to Defendants' purposeful contacts with the United States and the state of New York.  But for Defendants' voluntary contacts with New York and the U.S. as a whole, neither Plaintiff nor L43 would have suffered the financial injuries for which relief is sought herein.

28.     On information and belief, Defendants Behar and Fung have their principal places of business in the State of New York and are also residents of this State.

## **INTRODUCTION**

29.      The Company was formed in 2019 by Ms. Ramos and her business partner and then-current romantic partner Zoffoli.  The Company's only members are Ramos and Zoffoli, who each hold 50 percent of the Company's membership units.

30.   The Company was formed to design, manufacture and sell various products including vaporizers and vaporizer cartridges made in the United States. Vaporizers are devices which are used for the inhalation of various products, including tobacco, essential oils, medications, and cannabis.  Cartridges for those devices hold the liquid product to be vaporized and are inserted into a vaporizer base.

31.   The market for vaporizers is still in its early stages, but demand for vaporizers (and cartridges) and the growth of the bourgeoning cannabis industry in the United States have led observers to conclude that the market for vaporizers is highly lucrative with tremendous growth potential.

32.   For example, a report authored by Grand View Research in March 2022 entitled "E-cigarette And Vape Market  Size, Share & Trends Analysis Report By Product (Disposable, Rechargeable), By Distribution Channel (Online, Retail), By Region,   And   Segment   Forecasts,   2022   –   2030"   (available   at https://www.grandviewresearch.com/industry-analysis/e-cigarette-vaping-market (last accessed May 18, 2022)) observes that the "global e-cigarette and vape market size was valued at USD 18.13 billion in 2021 and is expected to expand at a compound annual growth rate (CAGR) of 30.0% from 2022 to 2030" and further notes that "North America dominated the global market with a share of over 40% in 2021."

33.     The same Grand View Research report stated that the market size for the industry in 2022 had an estimated value of USD $22.46 billion and was projected to generate revenues by 2030 of USD $182.84 billion.

34.     On or around February 24, 2020, Zoffoli transferred the intellectual property rights for a valuable vaporizer device known as a DZD Cartomizer (the "Cartomizer") from himself to L43.

35.     The creation of the Cartomizer was expensive and involved the investment of substantial time and resources.   Its confidentiality was costly to maintain.

36.     Developing the Cartomizer required developing formulas, compilations, programs, designs, functions, methods, techniques, and/or processes that: (a) derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use; and (b) were the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

37.     Later in 2020, Ms. Ramos and Zoffoli experienced a personal falling out partially caused by Zoffoli's unauthorized use of the Company's funds for his own personal expenses. Ms. Ramos and Zoffoli concluded they could no longer be business partners.

38.     Following their falling out, Ms. Ramos offered to allow Zoffoli to purchase her interest in L43.  Zoffoli accepted, in principle, her buy-out offer.

39.     In light of Zoffoli's past unauthorized use of Company funds for his personal needs, Ms. Ramos reasonably insisted that the buyout be conditioned on a number of corporate governance clauses which would prevent Zoffoli and several of his affiliates from further plundering the Company's assets for personal use.

40.     Zoffoli never intended to make a good faith buyout offer.  Zoffoli, along with Defendants Behar and Fung, conspired to steal the Cartomizer's design and introduce it onto the market through a directly competing company.

41.     On information and belief, Zoffoli, assisted by Defendant Hill, and L43's former corporate counsel, Defendant Behar, an attorney admitted to practice in New York with his principal place of business in this District, created a Wyoming-based limited liability company to execute this scheme, despite knowing that the vaporizer designs were L43's intellectual property and trade secrets.  That Wyoming LLC is defendant Vantage.

42.     On information and belief, in part because of their knowing illegal usurpation of L43's intellectual property, trade secrets, confidential information, and business opportunities, Defendants formed Vantage for the purpose of avoiding liability to plaintiff and L43 for their brazenly illegal scheme and conduct.

43.     Defendants thus illegally usurped and aided and abetted the usurpation of business opportunities they knew or deliberately or recklessly ignored rightfully belonged to the Company.

44.     In this lawsuit, Ramos seeks damages from Defendants for breaching, aiding and abetting, and conspiring to breach Zoffoli's fiduciary duties to both Ramos directly and L43 derivatively, misappropriating L43's intellectual property, misappropriating trade secrets, engaging in unfair competition, and violating and conspiring to violate the DTSA and the common law.

## FACTUAL BACKGROUND

**A.     Ramos Meets the Defendants and they Forge a Relationship**

45.     Ramos initially met Fung in 2017.

46.     According to his publicly available LinkedIn page, Fung "specializes in innovative vape pens & exclusive vape products designed by extract artists from across the country." Fung also touts himself as an "expert at corporate communications and works great as the leader of a team." Fung also describes himself as a "successful, serial entrepreneur," and currently owns a New York-based vaporizer business called American Made Vapes, Inc. (Defendant AMVI). *See* https://www.americanmadevape.com/bio.

47.     At various times, Fung mailed to Plaintiff certain vaping products and paid to Plaintiff commissions for any new accounts she sourced.

48.     Plaintiff would contact various stores and inform them about DankFung's (Fung's company) products, and would provide the vendors samples, etc. Fung would mail Plaintiff DankFung's products to her then-current home address in Tuckahoe, NY.

49.     Ramos first met Zoffoli in December 2017 at a trade networking event hosted by The Blinc Group ("Blinc"), one of the leaders in the vaporizer industry. At that time, Zoffoli owned and managed an unsuccessful business in the vaporizer industry named "Nice Steams."

50.     Zoffoli touted Nice Steams as a manufacturer of vaporizer products. Nice Steams, however, never brought a product to market nor made a penny in revenue.

51.     As a result, by the time he met Ramos, Zoffoli was facing personal financial difficulties and his business had little to no prospects of success.

52.     Five months after they met, Ramos and Zoffoli began a romantic relationship, and later decided to enter the vaporizer industry together.

53.     In furtherance of their planned joint business venture, Ramos began working on vaporizer-related projects full-time in or around May 2018 and continued to develop a network of business contacts in the vaporizer and cannabis industries thereafter.

54.     Ramos' contacts included Fung whom, as noted above, Ramos had worked with several times over the course of 2017 and 2018.

55.     Ramos also worked diligently to develop relationships with other contacts who would be able to help her and Zoffoli finance, manufacture, and distribute products for their joint venture.

56.     Zoffoli did not contribute to the Company's development at this stage.

**B.     The Company is Formed**

57.     In March of 2019, Ramos and Zoffoli formed L43 as a Delaware limited liability company.  At formation, and at all times thereafter, Ramos and Zoffoli each held 50 percent of the membership interests of the Company.

58.     While each of Ramos and Zoffoli held 50 percent of the Company's membership interests, work on behalf of the Company was not divided equally between Ramos and Zoffoli.  Ramos did most of the work to build the Company into a viable enterprise and manage its day-to-day affairs, just as she had done in laying the groundwork for the Company prior to its formation.

59.     Ramos took exclusive responsibility for forming the Company, developing its business network, hiring its personnel, managing its finances and executing necessary contracts.

60.     In contrast Zoffoli performed minimal work on behalf of the Company.  Formally, Zoffoli was listed as a Company officer.  In reality, however, Zoffoli

performed little meaningful work on the Company's behalf.  Indeed, if not directly supervised by Ramos, he did no work at all.

61.     Unbeknownst to Ramos, Zoffoli also used the Company's bank accounts for personal expenses on repeated occasions, overdrawing one of the accounts at least once.

62.     While Zoffoli only sporadically contributed to L43's business development efforts, he was able to contribute to the Company in one important manner: on or around February 24, 2020, Zoffoli transferred the Cartomizer's intellectual property (IP) rights to the Company.  Exhibit A.

63.     Upon information and belief, Zoffoli effected this transfer by executing a Statement under 37 C.F.R. 3.73(c) with the United States Patent & Trademark Office (the "USPTO"), and also executed a number of other documents indicating his intention to transfer the entirety of his interest in the Cartomizer to the Company.

64.     After Zoffoli effectuated that transfer, the Cartomizer's IP rights became the Company's exclusive property.

## C.     Ramos Establishes the Company's Manufacturing and Distribution Infrastructure

65.     Ramos continued to develop a business infrastructure that would allow the Company to finance the Cartomizer's manufacturing and distribution.

66.     Ramos devoted substantial time, energy and resources to developing L43's infrastructure.

67.     The Cartomizer was to be manufactured in the United States by automated means, *i.e.*, by robots.

68.     Ramos located a robot manufacturer that agreed to design and build the robots needed to manufacture the Cartomizer.  That manufacturer was Universal Machine & Engineering Corporation ("UMC").  Ramos' contact at UMC was Randy Backich ("Backich").

69.     Upon information and belief, Backich left UMC for a competitor, NJM Packaging ("NJM"), but Backich took with him the opportunity to build the robots for the Company.

70.     Ramos also secured a contract packaging company that would house the Company's robotic manufacturing machines and package the Cartomizers as they were produced.  That company was named AmeriPac Inc.  Ramos' contact at AmeriPac was Jeff Lemke.

71.     Ramos also located the necessary suppliers of the parts needed to build the Cartomizers.

72.     By way of two examples, Ramos secured a supply relationship with Rocky Mountain Materials Solutions, LLC, a manufacturer of the heating elements used in the Cartomizer, and a supply relationship with Pegasus Industrial Specialties Inc., a supplier of the glass tubing used in the Cartomizer.

73.     Through Ramos's efforts, the Company secured all the manufacturers or vendors for each of the thirteen (13) parts that comprise the Cartomizer.

**D.      Ramos Secures a Long-Term Buyer for the Cartomizer**

74.     Ramos initially sought investors to provide financing for L43's operations before the Company could begin manufacturing and selling its products. Ramos envisioned that the Company, once adequately funded, would be able to distribute its products nationwide, with an eye towards global distribution soon thereafter.

75.     Ramos contacted Defendant Fung upon learning that Fung was interested in shifting the focus of his operations focus from Asia to the United States. Fung was interested in becoming the Cartomizer's exclusive distributor.

76.     Because the Cartomizer was not yet in production, a question remained as to the Cartomizer's production cost.  Fung paid the Company approximately $400,000 to complete a feasibility study and to determine the price point that the Company could achieve once the product was in production.

77.     The Company completed that study in or around July 2019 and determined that the Company could supply the Cartomizer at or below the price point Fung required.

78.     As a result of the successful feasibility study, Fung and the Company decided that a long-term distribution agreement would be mutually beneficial, with

the Company agreeing to supply the Cartomizer exclusively to Fung in exchange for a long-term purchase commitment.

79.     Through Ramos's efforts, on or around March 20, 2020, Fung and the Company executed a Letter of Intent ("LoI") making clear that the Company would manufacturer the Cartomizer exclusively for distribution and sale by Fung-owned entity Midas Ventures, LLC ("Midas Ventures" d/b/a American Made Vapes, Inc. ("AMVI")).  Pursuant to the LoI, Midas Ventures was to purchase at least 60 million Cartomizers from the Company during the first year of the parties' relationship. Exhibit B.

80.     The LoI contemplated the execution of a formal sales contract between the Company and Midas Ventures and that $9 million would be paid to the Company upon that contract's execution.

**E.     Fung Attempts to Steal L43's IP, and the Parties enter into a Non-Disclosure Agreement**

81.     On or around August 23, 2019, Fung applied for a patent that covered the same technology and design as that of the Cartomizer.  That application was filed with the USPTO and given patent application number 62/891,040 the ("'040 Application").

82.     Ramos and Zoffoli eventually discovered the '040 Application and confronted Fung.  Caught red-handed, Fung, at Ramos's insistence, entered into a Patent Ownership Agreement with the Company on July 21, 2020.  Exhibit C.

83.    The Patent Ownership Agreement made clear that neither Fung nor any entity or affiliate associated with Fung had any ownership rights to the Cartomizer design or related intellectual property.

84.    The Patent Ownership Agreement also memorialized Fung's promise that neither he nor his affiliate companies would file any patent applications seeking protection of any design substantially similar to the Cartomizer's design.

85.    On or around August 13, 2020, Fung, on behalf of American Made Vape, Inc., executed a non-disclosure agreement (the "Fung NDA") which Zoffoli counter executed on L43's behalf on September 2, 2020.  A copy of the Fung NDA is attached hereto as Exhibit D.

86.    On information and belief, each Defendant was aware that the Fung NDA had been executed, and were aware of, and understood, its terms and conditions.

87.    The Fung NDA defined the Cartomizer as the "Product".

88.    The Fung NDA defined the "Business Purpose" as enabling Fung to evaluate the information and samples of the Cartomizer "for the purpose of consummating purchases pursuant to an exclusive supply agreement."

89.    The Fung NDA makes clear that the information Fung learned from Ramos and L43 is confidential, proprietary, and a trade secret, and states at ¶1:

> For purposes of this Agreement the parties acknowledge that all the tangible and intangible information, including observations from handling Product,

data (of whatever type or description and whether or not capable of being reduced to a written form) and sample Product ("Confidential Information and Product") provided by L43 to the other party, is confidential, proprietary, and a trade secret of L43.  The parties agree that this Agreement applies to L43, its operating companies and its affiliates, wherever and whomever situate [sic].

90.    The Fung NDA also made expressly clear the limits on Fung's and AMVI's right to use the Confidential Information for only the defined Business Purpose, and states at ¶2 "[a]ll Confidential Information disclosed to the Receiving Party will be used solely for the Business Purpose and for no other purpose whatsoever."  (Emphasis added).

91.    The Fung NDA also expressly prohibited Fung and AMVI from replicating or attempting to replicate the Cartomizer or to copy any of the Confidential Information, and states at ¶3, "Receiving Party shall not make any copies of L43's Confidential Information nor tamper with the sample Product nor attempt to replicate Product in any way shape or form.  After testing Product, Receiving Party shall promptly return the sample Product to L43." (Emphasis added).

92.    The Fung NDA also made clear that the Company retained all rights to the Product, and states at ¶4, "[a]ll right title and interest to and in the Confidential Information and Product shall remain with L43.  Nothing in this Agreement is intended to grant any rights to the Receiving Party under any patents, copyrights, trademarks, or trade secrets of L43."  (Emphasis added).

93.     The Fung NDA states at ¶6 that the parties consented to jurisdiction in this District for injunctive relief and such other relief as may be just and proper.

94.     The Fung NDA also, at ¶7, required AMVI to:

…[P]romptly disclose to L43 <u>any and all product concepts, processes, formulas, inventions, and improvements it may make or conceive resulting from or relating to the review of and/or use of the Confidential Information and Product, or otherwise relating from or related to any work performed by this Agreement, and all such product concepts, developments, processes, formulas, inventions and improvements shall be deemed to be Confidential Information covered by this Agreement</u>.  (Emphasis added).

95.     On information and belief, Defendants never made the above required disclosures to L43.

96.     Furthermore, the Fung NDA also provided, at ¶8, that L43 was entitled to all rights in any IP that AMVI developed from information and products referenced in the preceding paragraph, stating:

The Receiving Party shall and does hereby grant and assign to L43 its entire right, title and interest in and to any and all applications for trademarks, copyrights, patent or other industrial [sic] property protection which may be prepared <u>or filed for any such product concepts, developments, formulas, invention, and improvements referred to in paragraph 7 above</u>, and any and all registrations and patents which may be issued or granted upon any and all of such applications in any and all countries of the world.

97.     On information and belief, Defendants have never assigned such rights to L43.

98.     In addition, ¶9 of the Fung NDA required AMVI to "execute and deliver to L43 all descriptions, applications, assignments, and other instruments

necessary or proper in L43's opinion to carry out its obligations under paragraphs 7 and 8 above."

99.    On information and belief, Defendants did not comply with this obligation.

100.   Paragraph 10 of the Fung NDA disclosed that "[t]he disclosure to the Receiving Party of the Confidential Information and Product shall not be construed as granting the receiving party a license or any rights to any present or future, trademarks, copyrights, patents, or other industrial [sic] property protection, or applications thereof, of L43 relating to the Confidential Information and Product."

101.   Paragraph 13 of the Fung NDA provided that the agreement could not be assigned by either party absent the other party's prior written consent.

## F.    Ramos Engages Professionals and Employees to Move the Company Forward

102.   Beginning in the Spring of 2020, Ramos engaged or hired several professionals and employees for the Company.

103.   The first of Ramos's hires was Defendant Behar, the aforementioned New York attorney who agreed to serve as the Company's corporate counsel in May of 2020.  Exhibit E.

104.   Ramos next hired Patrick Bright, a California-based attorney whom Ramos enlisted to bolster the Company's intellectual property rights.  *See* Exhibit F (check from L43 payable to Bright).

105.   Ramos's final professional hire was Defendant Hill.  After signing a non-disclosure agreement, Hill initially was engaged as a part-time consultant, and was anticipated, subject to satisfactory performance and a background check, to eventually become the Company's Chief Executive Officer.  Exhibit G (Hill NDA). However, he never assumed that title.

106.   Despite his anticipated title, Hill would have only two job duties in practice: (a) maintaining L43's relations with Fung; and (b) managing the expert, highly-specialized contractors the Company required to manufacture the Cartomizer.

107.   Hill had no background in financial management, business strategy, or other tasks generally associated with a CEO's expected and traditional duties.

108.   Nonetheless, pointing to his future expected CEO role, Hill demanded a princely salary and equity in the Company.  Hill claimed his compensation demands were justified and complained that he allegedly was suffering serious personal financial difficulties and supposedly needed a higher salary to remedy those problems.  The Company and Hill never arrived at a final agreement.

## G.   Ramos Readies the Company to Commence Production

109.   As a result of Ramos' successful efforts to establish L43's manufacturing capacity and product distribution, the Company was well-positioned

to realize its goals.  By November of 2020, the Company and Fung were finalizing their long-term distribution agreement's terms.

110.   Pursuant to a draft "Exclusive Distribution Agreement," Fung (through Midas Ventures) would purchase at least 300 million Cartomizers over an initial five-year term, at prices of between $1.941 and $2.4992 per Cartomizer.

111.   In addition, Ramos had planned an additional global rollout of the Company's products by the end of 2022, which was expected to add to L43's sales.

112.   As a result of Ramos's laborious efforts, all the pieces were in place, including financing, manufacturing, packaging, and distribution.  The Company was finally ready to start producing Cartomizer.

## H.   Zoffoli's Erratic Behavior Threatens the Company

113.   Although, thanks to Ramos's efforts, the Company's business prospects were positive, the business soon became threatened by Zoffoli's increasingly erratic behavior.

114.   Zoffoli began refusing to perform any substantive work whatsoever on the Company's behalf.  Ramos had to push Zoffoli to perform any work, and often had to prevent him from communicating with business contacts and partners because she reasonably feared his constant lack of professionalism and erratic behavior threatened to damage the Company's business prospects and reputation.

115.   Zoffoli also repeatedly tried to use L43 as his own personal piggy bank, at one point telling Ramos that he wanted to use the contemplated $9 million initial purchase order for the Cartomizer to buy a mansion, farm, luxury cars, and a golf course rather than using it for L43's operations and product manufacturing.

116.   Due to these and other remarks, and Zoffoli's demonstrated reckless financial behavior, Ramos reasonably feared Zoffoli was scheming to put his personal selfish interests ahead of the Company's.  Ramos correctly regarded Zoffoli as a critical, material threat to the Company's future.

117.   Due to these issues and other significant interpersonal matters, Ramos ended her romantic relationship with Zoffoli in August 2020.   She then later determined that their personal and business differences made it difficult for them to remain partners in the Company.

## I.   Ramos Contemplates a Buyout of Her 50 Percent Interest in the Company

118.   After ending her relationship with Zoffoli, Ramos contemplated selling her 50 percent interest in the Company to Zoffoli for cash coupled with a royalty payment tied to the future sale of each unit of the Company's products.

119.   However, considering her past experience with Zoffoli's unreliability and selfish conduct, Ramos had legitimate doubts about Zoffoli's managerial competence, which threatened to render any potential royalty component worthless to her.

120.   Zoffoli, Behar, and Hill became aware that Ramos was open to a potential buyout.

121.   In a November 12, 2020, email to Ramos, Zoffoli acknowledged he could no longer jointly run the Company with Ramos.  Zoffoli further stated that he intended to buy Ramos' 50 percent interest in the Company, writing: "*I respectfully accept your request to be bought out of your interest and intend to make you a very fair offer in short order.*"  Exhibit H.

122.   Ramos, however, was concerned that Zoffoli, all too often reluctant to perform any work for the Company, would give the inexperienced and barely competent Hill too much authority within the Company.

123.   By this point, Hill and his wife had told Ramos on numerous occasions that their personal financial problems were severe and demanded that L43 provide him a large payment to alleviate those alleged personal financial problems.

124.   Ramos grew concerned that Hill, the Company's contemplated CEO, would attempt—like her ex-boyfriend Zoffoli—to use L43's assets and prospects to enrich himself at the Company's expense.

125.   On or around September 7, 2020, and despite her efforts, Zoffoli and Hill ceased communicating with Ramos. Neither had any communication with Ramos until over two months later.

**J.     Zoffoli Reemerges and Indicates His Interest in Buying Out Ramos, While Simultaneously Establishing an Entity to Steal the Company's Business**

126.   Shortly after Zoffoli stopped communicating with Ramos—and unbeknownst to Ramos—Zoffoli contacted Bright, the California intellectual property attorney Ramos had hired for the Company.

127.   Upon information and belief, Zoffoli told Bright that he and Ramos had fallen out, and that he wanted to transfer the rights to the Company's IP away from L43, and, by extension, Plaintiff.

128.   Bright relayed Zoffoli's plans to steal the Company's IP to Ramos. Ramos then revealed Zoffoli's plot to Behar, the Company's attorney.  Behar in turn falsely assured Ramos that Zoffoli could not transfer away the Company's IP rights.

129.   Behar also knew Ramos was open to a buyout of her interest in the Company.  Behar, who was aware of the Fung NDA's terms, and who also knew, or deliberately, recklessly, or negligently ignored that Zoffoli was advancing his own selfish interests to L43's detriment, advised Ramos to allow Zoffoli to proceed with a buyout.

130.  On information and belief, Behar, who knew that his professional obligations ran to L43, and owed it duties of competence, loyalty, and honesty, was aware that Zoffoli and Fung planned to abscond with L43's assets and prospects, and nonetheless lured Ramos into negotiating a deal with her former partner, all the

while having no intention of fulfilling their obligations under any such agreement, or the requirements set forth in the Fung NDA.  Instead, Behar, in a grotesque breach of professional ethics, assumed that Ramos simply would not have the patience and resources to litigate or otherwise address the matter.

131.  Because of her grave concerns about Zoffoli's managerial competence, Ramos reasonably believed that any buyout structure which included an unsecured future royalty component had to be accompanied by governance protections, including limitations on Zoffoli's discretion over the Company's finances.  To that end, Ramos suggested to Behar that the Company engage a third-party manager for the Company.

132.  Behar, however, disingenuously advised Ramos to accept a buyout without insisting on the engagement of an independent third-party manager for the Company, even though Behar knew, or deliberately, recklessly, or negligently ignored the facts that: (a) Zoffoli, Fung, and Hill were out for themselves and had no intention of directing a revenue stream to L43 which in turn would deliver to Plaintiff the earn-outs she had negotiated for, and (b) absent a third-party manager "watchdog," no one would protect L43's interests, and, by extension, Ramos's rights.

133.  Aware that Zoffoli could not be trusted absent a third-party manager, Ramos refused to agree to the buyout. As such both Ramos and Zoffoli remained

50/50 owners of L43 and continued to owe both the Company and each other fiduciary duties.

## K.    Zoffoli, Behar, and Hill Hatch Plan B – The Outright Theft of the Company's Business

134.    Unbeknownst to Ramos, Zoffoli was conspiring with Behar and Hill to steal *all* of L43's business – intellectual property, operations, suppliers, advisors, industry contacts, buyers and all business opportunities – in the event that Ramos insisted on conditioning a buyout on meaningful governance protections or the retention of an independent manager.

135.    On September 28, 2020, without Plaintiff's knowledge or consent, Behar (while still serving as the Company's counsel) formed a Wyoming limited liability company, Defendant Vantage.  Exhibit I.

## L.    The Bad Faith Buyout Negotiations

136.    Beginning in late 2020, Ramos and Zoffoli negotiated to buyout of Ramos' interest in the Company.  Through counsel, the parties negotiated various term sheets.

137.    The Parties agreed in principle that Zoffoli would buy Ramos' interest in the Company for the sum of $36,000,000, most of which would be paid to Ramos in the form of monthly royalties from the sale of Cartomizers.[1]

---

[1] The parties agreed that Ramos would receive a lump sum cash payment of $1,800,000 upon Fung's first payment to the Company under the Exclusive

138.   During the negotiations, Ramos continued to reasonably insist that the buyout be conditioned on governance protections or the engagement of outside professionals to ensure the proper management of the Company and the value of the contemplated monthly royalties.

139.   Specifically, Ramos requested provisions requiring that upon Ramos' buyout, the Company would engage an accountant who would provide monthly reports to Ramos about the Company's finances and report "any activity that would jeopardize her payment."

140.   Ramos also demanded that Zoffoli's discretion over hiring be limited. Ramos proposed that an independent human resources professional, Larissa Hanpeter, have exclusive authority to propose candidates for high-level positions within the Company and determine their salary and benefits packages.   Zoffoli would retain the ultimate say about whom to hire but would only be able to pick candidates from the pool proposed by Hanpeter.

141.   Ramos sent a draft buyout agreement to Zoffoli on January 14, 2021. Zoffoli sent a redline counterproposal (prepared by Zoffoli's counsel) to Ramos on January 18, 2021.

---

Distribution Agreement.  In addition to the initial $1,800,000 payment, the Parties agreed that Ramos would receive at least $34,200,000 in royalty payments.

142.   On January 29, 2021, Zoffoli and Ramos executed a document titled "Interim Agreement Terms – 1/29/21."  The document stated, "*as of today, the parties will be governed by the January 19 proposed term sheet until a final term sheet is agreed upon by both parties, and any future changes to that term sheet will bind both parties.*"  *See* attached Exhibit J.

143.   Accordingly, the Interim Agreement Terms constituted a binding contract, rather than a mere "agreement-to-agree."

144.   The Interim Agreement Terms also provided that "*the parties agree to negotiate in good faith on the basis of the January 19 term sheet. . . with a view to executing a final buyout agreement purchasing* [Ramos'] *interest in* [the Company] *within 30 days.*"

145.   No buyout agreement was ever finalized.  Upon information and belief, Defendants Zoffoli, Hill, and Behar were dissatisfied with the governance provisions of the buyout agreement Ramos had sensibly and reasonably requested.

146.   Instead, Zoffoli, Hill and Behar, and upon information and belief, with Fung's knowledge and encouragement, executed on their "Plan B"—the diversion of all of the Company's business to Vantage.

147.   Upon information and belief, Zoffoli, Hill and Behar are Vantage's principals.  Also, upon information and belief, Behar acts as legal counsel to Vantage.

148.   Hill advertises himself as Vantage's CEO.  In early 2021, Hill conveyed to Backich (the individual whose then-current company was anticipated to build the robots to assemble the Cartomizer) that he was Vantage's CEO, that L43 was, allegedly, no longer the relevant entity with respect to Cartomizer manufacturing, and that Ramos was supposedly "out of the picture."

149.   Though Zoffoli's role at Vantage is not fully clear, upon information and belief, Zoffoli manages the entity's finances.  Zoffoli sent at least five checks from a bank account held by Vantage to Allan Civitate, a personal creditor of Zoffoli's.  Exhibit K, at ¶17.  Indeed, recently, Civatate entered a judgment against Zoffoli for monies Zoffoli had promised to pay to satisfy his debts, but which he had not paid.

150.   Even though buyout negotiations were ongoing, upon information and belief, Zoffoli, Hill and Behar also were simultaneously conducting secret discussions with Fung.

151.   Upon information and belief, though he was fully aware that the Fung NDA directly prohibited him from doing so, and was also aware or deliberately, recklessly, or negligently in ignorance of the fact that his co-Defendants were brazenly breaching their obligations to L43 and the Company, Fung agreed to transfer his business and purchasing commitments from the Company to Vantage.

152.    Once Fung's business and purchasing commitments were secured, Zoffoli, Hill and Behar consummated their illicit plan and transferred all of the Company's business and assets to Vantage.

## DEMAND FUTILITY ALLEGATIONS

153.    Ramos brings claims I through IX herein of this Action derivatively on behalf of the Company in her capacity as the holder of 50 percent of L43's membership interests.

154.    A demand that the Company bring an action against Defendants based on the allegations herein is futile.  Zoffoli holds 50 percent of the Company's membership interests. The claims in this action are based upon, *inter alia*, Zoffoli's breaches of fiduciary duties, and his conspiratorial conduct with the other Defendants, including Vantage, of which he is a membership unit holder.

155.    As such, Zoffoli faces a substantial risk of an adverse determination in this action and, accordingly, is conflicted by his own self-interest.  Zoffoli cannot be counted on to objectively evaluate the merits of a lawsuit against himself, rendering demand upon the Company futile.

## COUNT I
## BREACH OF FIDUCIARY DUTY
**(Derivatively and Directly Against Defendants Zoffoli, Behar, and Hill)**

156.    Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

157.   As a manager and holder of 50 percent of the membership interests in the Company, Zoffoli owes the Company fiduciary duties, including the duty of loyalty, good faith, oversight and disclosure. Zoffoli consistently, however, acted in his own self-interest to the detriment of both Ramos and the Company.

158.   Furthermore, as a 50% membership interest holder, Zoffoli also owed these fiduciary duties to Ramos directly.

159.   As the attorney for L43, Behar owed the Company professional, ethical, and fiduciary duties, including duties of loyalty, competence, care, disclosure and oversight.  But, like Zoffoli, he breached his obligations and instead acted in his own self-interest to both Ramos's and the Company's material detriment.

160.   Similarly, as a retained consultant serving executive functions for the Company, and who was intended to serve as L43's CEO, Hill also owed the Company fiduciary duties of loyalty, competence, care, disclosure, and oversight, all of which he failed to honor.

161.   Zoffoli, Behar and Hill are occasionally referred to herein as the "L43 Defendants".

162.   Based upon Defendants actions as described above, the L43 Defendants breached their respective duties of loyalty, care, good faith, competence and disclosure to the Company and Plaintiff and caused L43 and Ramos to suffer substantial damages.

## COUNT II
## CORPORATE WASTE
### (Derivatively against Zoffoli, Behar, and Hill)

163.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

164.   As managers, 50 percent unit holders, and/or attorneys for L43, the L43 Defendants each had a duty to protect the Company's assets from loss or waste.

165.   By enabling Fung to breach the Fung NDA, by secretly forming Vantage and siphoning away all of L43's business, assets and IP, each of the L43 Defendants breached this duty and caused the Company to waste its assets.

166.   Based on Defendants conduct as described above, the L43 Defendants caused L43 to suffer substantial damages.

## COUNT III
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND CONSPIRING TO BREACH OF FIDUCIARY DUTY
### (Derivatively and Directly Against Fung, AMVI, and Vantage)

167.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

168.   Defendants Fung, AMVI, and Vantage are occasionally referred to herein collectively as the "Colluding Defendants".

169.   Defendants Fung, AMVI, and Vantage aided and abetted the L43 Defendants in breaching their fiduciary duties owed to Ramos and the Company.

170.   The L43 Defendants owed the Company and Ramos certain fiduciary duties as fully set forth herein.

171.   By committing the acts alleged herein, the L43 Defendants breached their fiduciary duties owed to Plaintiff and the Company.

172.   Each Colluding Defendant colluded in or aided and abetted the L43 Defendants' breaches of fiduciary duty to the Company and Ramos and were active and knowing participants in the L43 Defendants' breaches of fiduciary duties owed to plaintiff and L43.   Each Colluding Defendant knew about or deliberately, recklessly, or negligently disregarded the L43 Defendants' breaches of fiduciary duty, which were and are continuing, as set forth with particularity herein.

173.   The Colluding Defendants used their knowledge of the L43 Defendants' breaches of fiduciary duty owed to both the Company and Ramos to gain unfair advantages and benefits knowing or deliberately, recklessly, or negligently ignoring that such advantages were a direct result of those breaches.

174.   Each of the Colluding Defendants committed tortious acts in concert with each other and the L43 Defendants, and did so pursuant to a common design, agreement, scheme, or plan.

175.   Each of the Colluding Defendants entered into an agreement to perform an illegal act in the form of causing and encouraging the L43 Defendants to steal the

Company's business and prospects and trade secrets, or, alternatively agreed to perform putatively legal acts in an illegal manner.

176. Each of the Colluding Defendants knew that the L43 Defendants' conduct was a breach of duty yet gave substantial assistance and encouragement to both the L43 Defendants and their fellow Colluding Defendants.

177. Furthermore, Fung and AMVI gave substantial assistance to the L43 Defendants and the other Colluding Defendants in accomplishing these tortious roles, but because AMVI, through Fung, is a signatory to the Fung NDA, Fung and AMVI's conduct, separately considered, constituted breaches of the duty of good faith and fair dealing to both L43 and Ramos.

178. Based on the Defendants conduct as described above, the Colluding Defendants aided and abetted and/or conspired with the L43 Defendants to aid the latter group's breaches of fiduciary duty and caused both L43 and Ramos to suffer substantial damages.

**<u>COUNT IV</u>**
**VIOLATION OF THE**
**DEFENSE OF TRADE SECRETS ACT (18 U.S.C. §1836)**
**<u>(Derivatively against all Defendants)</u>**

179. Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

180. L43's Confidential Information and Products and trade secrets, including the Cartomizer, are the result of years of work and substantial expenditure

of time, effort, and expense and constitute trade secrets within the meaning of applicable law, including without limitation the DTSA.

181.   The Confidential Information and trade secrets acquired by and developed by L43 derive independent economic value, actual or potential, from the fact that they are not generally known to, and not readily ascertainable through proper means by, the public.

182.   L43 has taken reasonable measures to maintain the secrecy of its Confidential Information and trade secrets.

183.   By reason of the foregoing, the Defendants acquired and/or disclosed the Company's Confidential and trade secrets absent the authorization, knowledge, or consent of L43 or Plaintiff.

184.   The Defendants each acquired or disclosed L43's Confidential Information and trade secrets in violation of their duties to maintain their secrecy.

185.   By reason of the foregoing, the Defendants willfully and maliciously misappropriated L43's Confidential Information and trade secrets through improper means within the meaning of DTSA §1839(5)-(6).

186.   The Company had not and does not consent, expressly or impliedly, to Defendants use or disclosure of any Confidential Information or trade secrets.

187.   The DTSA permits damages for the actual loss caused by the misappropriation of the trade secrets and damages for any unjust enrichment caused

by such misappropriation of the trade secret that is not addressed in computing damages for actual loss. DTSA §1836(3)(B).

188.   The DTSA allows for an award of exemplary damages for willful and malicious misappropriation. DTSA §1836(3)(C).

189.   The DTSA permits injunctive relief to prevent any actual or threatened misappropriation of trade secrets.  DTSA §1836(A).

190.   L43 is being or will be harmed through the misappropriation of its Confidential Information and trade secrets.  The precise amount of the harm will be difficult, and perhaps impossible, to ascertain, and such harm is likely to be irreparable.

191.   The harm which L43 will suffer if Defendants are not enjoined far outweighs any harm Defendants will suffer from the issuance of injunctive relief.

## COUNT V
### (MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CONNECTICUT'S UNIFORM TRADE SECRETS ACT)
### (Derivatively against all Defendants)

192.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

193.   Defendants were provided access to Confidential Information and trade secrets belonging to L43, related to the design, concept and development of the Cartomizer.

194.   This proprietary and confidential information constitutes trade secrets owned exclusively by L43.

195.   This Confidential Information and trade secrets are highly guarded by the Company, was unknown outside of L43's business, and is highly valuable to L43's business.

196.   Defendants had contractual or fiduciary obligations to protect and not misappropriate this Confidential Information and trade secrets.

197.   Upon information and belief, Defendants used this Confidential Information and trade secrets in connection with launching Vantage and doing business with AMVI.

198.   Upon information and belief, Defendants shared and disclosed this information with individuals and entities involved in Vantage and AMVI's development.

199.   The Confidential Information and trade secrets misappropriated by Defendants are of great value and importance to the Company, which has invested significant time, expense, and effort to develop it, in order to ensure L43 an advantage in the marketplace, including being the first company to market the Cartomizer.

200.   L43 and Plaintiff have sustained damages and injury as a result of Defendants' misappropriation of L43's Confidential Information and trade secrets

201.   The Company will also suffer irreparable damage and injury as a result of Defendants' misappropriation of L43's Confidential Information and trade secrets if the Defendants are not enjoined from their use thereof. There is no adequate remedy at law to compensate for the Plaintiff's damage and injury which the Defendants continue to inflict through their misappropriation.

**COUNT VI**
**(BREACH OF CONTRACT – FUNG NDA)**
**(Derivatively against Fung and AMVI)**

202.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

203.   The Fung NDA is a binding and enforceable agreement between L43 and AMVI, with Fung executing on AMVI's behalf.

204.   The Fung NDA expressly treats the Cartomizer as a trade secret and confidential information.

205.   On information and belief Fung is AMVI's sole equity holder.

206.   Under the Fung NDA's express terms, AMVI was prohibited from using L43's confidential information and trade secrets to replicate the Cartomizer in any shape or form.

207.   The Fung NDA expressly prohibited Fung and AMVI from using any information they received from L43 for any purpose other than the Business Purpose (as defined in the agreement) for the purpose or reviewing and evaluating the

information and samples of the Cartomizer to consummate purchases pursuant to an exclusive supply agreement between L43 and AMVI.

208.   The Fung NDA expressly obligates Fung and AMVI to promptly disclose to L43 any product concepts, developments, processes, formulas, inventions or improvements Defendants made from or relating to the Confidential Information and trade secrets resulting from or relating to any work performed under the Fung NDA.

209.   The Fung NDA expressly requires Fung and AMVI to grant and assign to the Company their entire right, title and interest in and to any IP applications or grants globally.

210.   The Fung NDA expressly obligates Fung and AMVI to execute and deliver to the Company all descriptions, applications, assignment and other instruments necessary or proper in L43's opinion to carry out Defendant's preceding obligation.

211.   Fung and AMVI materially breached the Fung NDA by failing to perform their obligations under said agreement, including but not limited to the obligations to (a) refrain from replicating the Cartomizer in any form or manner, (b) refrain from using Confidential Information and trade secrets in a manner not permitted under that agreement, and (c) assign all of AMVI's IP rights to L43 that were developed using Confidential Information.

212.   L43 fully performed and/or has been discharged of its obligation to perform, its contractual obligations under the Fung NDA.

213.   As a direct and proximate result of Fung and AMVI's breach of contract, L43 has suffered damages in an amount to be proven at trial.

### COUNT VII
### (TORTIOUS INTERFERENCE WITH BUSINESS/ECONOMIC OPPORTUNITY)
### (Derivatively and Directly Against All Defendants)

214.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

215.   L43 and Plaintiff entered into certain business relations to further develop the Cartomizer and its sale.

216.   Plaintiff also entered into certain business relations in order to protect her continuing economic interest in L43 and the Cartomizer once she sold her membership interest to Zoffoli.

217.   Defendants knew of L43's and Plaintiff's business relationships.

218.   Defendants, with wrongful, willful, wanton and malicious intent interfered with these business opportunities by, among other things, failing to comply with their obligations under the Fung NDA and Interim Agreement's Terms, misappropriating Confidential Information and trade secrets, and by developing and launching Vantage and engaging with AMVI to L43's and Plaintiff's exclusion,

developing relationships created by Plaintiff, such as using robots to build the Cartomizer, but now for Vantage's and AMVI's benefit.

219.   As a result of such wrongful means, Defendants interfered with L43's and Plaintiff's business relationships and opportunities.

220.   As a result of the interference with these business relationships and opportunities, L43 and Plaintiff have sustained damages in an amount to be proven at trial, which include the amount of profits they would have enjoyed but for Defendants' misappropriation of, and tortious interference with, L43's business opportunities and relationships, as well as damaging the integrity of the Company's Confidential Information, reputation, and goodwill.

221.   Plaintiff and L43 have been, and will continue to be, irreparably damaged and injured in their business by Defendants' misappropriation of, and tortious interference with, L43's and Plaintiff's business opportunities and relationships, if Defendants are not enjoined from further developing and selling the Cartomizer.  There is no adequate remedy at law for L43's and Plaintiff's injuries, which are continuing.

222.   Plaintiff and L43 are also each entitled to punitive damages for Defendants' wrongful, willful, wanton, and malicious acts in an amount to be determined at trial.

## COUNT VIII
## (CONVERSION)
### (Derivatively against all Defendants)

223.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

224.   At all relevant times, L43 had a possessory right and interest in its Confidential Information and trade secrets, including but not limited to the Cartomizer, and all of its IP.

225.   Defendants intentionally and illegally accessed and used that information and hereby denied or substantially interfered with the Company's possession of its property.

226.   The unconsented-to and illegal usurpation of L43's property, including its trade secrets and IP, has deprived L43 of documents, materials, products and IP belonging to the Company and highly relevant to L43's business and has caused and will continue to cause severe and irreparable harm to the Company.

227.    As a result of Defendants' wrongful actions described above, Plaintiff has been damaged by the deprivation of its ability to the use and enjoyment of its property and seeks compensatory and punitive damages in an amount to be determined at trial.

228.   Plaintiff also seeks equitable relief in the form of a preliminary and permanent injunction: (a) requiring Defendants to identify all materials, documents,

data, or other property deleted, downloaded, forwarded, printed, or otherwise transferred by Defendants from L43 to themselves or any third parties; (b) requiring Defendants to identify all Company materials, documents, data, or other property they deleted, downloaded, forwarded, printed, altered, or transferred from L43 to themselves including but not limited to any information maintained or stored on systems, computers, share drives, cloud drives, or other L43 locations; (c) enjoining Defendants from directly or indirectly accessing, using, reproducing, or disclosing any property obtained from their L43 including Company systems, computers, share drives, cloud drives, or other L43 locations; (d) requiring Defendants to identify all individuals and entities in possession of any materials or information obtained by Defendants from L43 or from Company systems, computers, share drives, cloud drives, or other L43 locations; and (e) requiring Defendants to retrieve and return to the Company all L43 property in their possession, including but not limited to all materials, documents, or data deleted, downloaded, forwarded, printed, altered, or transferred by Defendants from L43 to themselves or any third parties.

## COUNT IX
### (TRESPASS TO CHATTELS)
### (Derivatively against all Defendants)

229.   Ramos restates and incorporates all preceding paragraphs as if set forth fully herein.

230.   At all relevant times, L43 had a possessory right and interest in the Company's information, including the Cartomizer, its IP, trades secrets and Confidential Information

231.   Defendants intentionally accessed those materials and information for purely personal reasons without permission, thereby dispossessing L43 of such property and depriving the Company of its use without L43's or Plaintiff's consent.

232.   Defendant's conduct has dispossessed the Company of documents. Materials, IP and information belonging to L43 and relevant to L43's business and deprived the Company of its use, which has caused and will continue to cause severe and irreparable harm to L43.

233.   As a result of Defendants' wrongful actions described above, L43 has been damaged by the dispossession of its property and the deprivation of its ability to use such property and L43 seeks compensatory and punitive damages in an amount to be determined at trial.

234.   Plaintiff also seeks equitable relief in the form of a preliminary and permanent injunction: (a) requiring Defendants to identify all property, including data and documents deleted, downloaded, forwarded, printed, or otherwise transferred by Defendants to themselves or any third parties; (b) requiring Defendants to identify all L43 property, including documents or data, they deleted, downloaded, forwarded, printed, altered, or transferred to themselves or any third parties; (c) enjoining

Defendants from directly or indirectly accessing, using, reproducing, or disclosing any property obtained from the Company; (d) requiring Defendants to identify all individuals and entities in possession of any property, including any documents or data obtained by Defendants from L43; and (e) requiring Defendants to return to L43 all company property in their possession, including but not limited to all materials, documents,   data, or IP deleted, downloaded, forwarded, printed, altered, or transferred by Defendants to themselves or any third parties

## PRAYER FOR RELIEF

**WHEREFORE**, Ramos requests that the Court:

A.      Preliminarily and permanently enjoin Defendants, and all others acting in concert with them from using any assets of the Company, including, without limitation, its intellectual property and Confidential Information;

B.      Preliminarily and permanently enjoin Defendants and anyone acting in concert with them from using or disclosing to any person or entity any of L43's Confidential Information and trade secrets, and from continuing to breach or facilitate breaches of the Fung NDA;

C.      Permanently enjoin Defendants and all others acting in concert with them, from manufacturing or selling the Cartomizer or any product substantially similar thereto;

D.      Issue an order requiring Defendants to immediately preserve and return to L43 any Confidential Information and all copies thereof, in whatever form stored and maintained;

E.      Issue an order requiring an accounting as to all persons or entities to whom Defendants have in whole or in part disclosed Confidential Information and trade secrets;

F.      Award L43 and Ramos monetary damages in an amount to be determined at trial;

G.      Award L43 and Ramos punitive and exemplary damages in an amount to be awarded at trial;

H.      Require Defendants to provide an accounting to L43 and Ramos;

I.      Award L43 and Ramos the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

J.      Award L43 and Ramos pre- and post-judgment interest; and

K.      Grant L43 and Ramos such other and further relief as this Court deems just and equitable.

Dated:  July 12, 2022                                    **CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Joshua D. Glatter*
_____
Joshua D. Glatter
501 Fifth Avenue, 15th Floor
New York, New York 10017
(646) 992-4730

*Attorney for Plaintiff*